# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LEE ANTHONY BROWN,

                Plaintiff,

v.                                              Case No. 22-CV-1527

NANCY BOWENS, *et al.*,

                Defendants.

## DECISION AND ORDER

      Plaintiff Lee Anthony Brown, who is representing himself and currently confined at Oshkosh Correctional Institution, brings this lawsuit under 42 U.S.C. § 1983. Brown was allowed to proceed on a claim for deliberate indifference to medical needs under the Eighth Amendment because the defendants allegedly failed to treat his knee injury. The defendants filed a motion for summary judgment, which is fully briefed and ready for a decision. (ECF No. 19.) The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 6, 14.)

## PRELIMINARY MATTERS

      In their reply brief in support of their motion for summary judgment, the defendants argue that Brown failed to follow Federal Rule of Civil Procedure 56 and Civil Local Rule 56 in his response materials. Specifically, Brown did not respond to the defendants' proposed findings of fact. (ECF No. 29 at 2.) District courts are entitled to construe *pro se* submissions leniently and may overlook a plaintiff's noncompliance

by construing the limited evidence in the light most favorable to the plaintiff. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). While Brown's response materials do not formally conform with the rules, his response contains sufficient information to allow the court to rule on the defendants' motion for summary judgment. For summary judgment purposes, the complaint will be converted into an affidavit, *see Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017); *Owens v. Hinsley*, 635 F.3d 950, 954–55 (7th Cir. 2011). In addition, Brown cites to the defendants' exhibits. Where Brown uses facts that cannot be supported by the record or his complaint, the court will disregard those facts.

In short, the court will consider Brown's response where appropriate in deciding the summary judgment motions.

## FACTS

The facts are largely undisputed. On October 3, 2020, Brown fell down the stairs at Redgranite Correctional Institution. (ECF No. 21, ¶ 7.) That same day he had a telephonic consultation with an unnamed non-defendant nurse whom he told he fell down the stairs because his knee "gave out" and hyperextended. (*Id.*) The nurse told Brown to ice his knee and that the on-call nurse would examine him the next day. (*Id.*) Brown went to the Health Services Unit (HSU) the next day and told the on-call nurse that his knee gave out while he was on the stairs and that he was still waiting for his ACL to be repaired. (*Id.*, ¶ 8.) Brown was given crutches, placed on a low bunk restriction, and prescribed an icebag and Tylenol. (*Id.*) He was also placed on a no-

work restriction, told to refrain from sports or strenuous recreation activities, and to rest his leg. (*Id.*)

Also on October 4, 2020, Dr. Kira Labby (not a defendant) reviewed the report from Brown's examination with the on-call nurse and ordered Brown an ace wrap, ice therapy, Naproxen, and acetaminophen. (ECF No. 21, ¶ 9.) On October 7, 2020, Brown was seen by another non-defendant unnamed HSU nurse for a follow-up visit. (*Id.*, ¶ 10.) He was still using crutches but reported that his knee was improving. (*Id.*) That same day, Dr. Labby ordered an x-ray. (*Id.*, ¶ 11.)

On October 8, 2020, Brown had an x-ray on his knee, and the radiologist determined that "Brown had tricompartmental joint space narrowing, sclerosis, and osteophytosis, with middle degenerative changes without acute findings." (ECF No. 21, ¶ 12.) Tricompartmental joint space narrowing is a type of osteoarthritis that affects all three compartments of the knee. (*Id.*, ¶ 13.) Osteoarthritis is "the most common form of arthritis" where the cartilage that protects the bone wears down over time. (*Id.*, ¶ 16.) That same day Dr. Labby sent Brown a letter without his x-ray results. (*Id.*, ¶ 14.) She informed him that his "x-ray was negative for acute fracture. This is good news. You do have mild degenerative changes which are commonly seen once we reach our 30s-40s and beyond." (*Id.*)

On October 29, 2020, Dr. Labby examined Brown for his knee pain. (ECF No. 21, ¶ 19.) At that appointment Brown was walking without crutches, doing a home exercise program, and was able to work his job as a tray server in the cafeteria. (*Id.*) After the appointment Dr. Labby consulted with nursing at Waupun Memorial

3

Hospital Orthopedics, and Dr. Nelson (not a defendant), an orthopedic specialist, agreed to review Brown's x-rays and then follow up. (*Id.*, ¶ 20.)

On October 31, 2020, Brown transferred to Oshkosh Correctional Institution. (ECF No. 21, ¶ 21.) On November 3, 2020, Dr. Labby received an email from HSU staff informing her that Dr. Nelson had called and said "that she looked at Brown's knee x-rays and due to his young age, all conservative treatment must be attempted before anything surgical can be considered." (*Id.*, ¶ 22.) Dr. Nelson recommended physical therapy. (*Id.*)

Because Brown had transferred to Oshkosh, Dr. Labby sent Dr. Nelson's information to defendant Nancy Bowens, an Advanced Practice Nurse Prescriber (APNP) at Oshkosh, who took over Brown's treatment. (ECF No. 21, ¶¶ 2, 22.) Bowens replied to Dr. Labby's email, telling her that she placed a referral for Brown to be seen by the on-site physical therapist. (*Id.*, ¶ 23.) On November 18, 2020, Bowens also placed an order prescribing Brown Naproxen. (*Id.*, ¶ 24.)

On November 29, 2020, Brown was examined by unidentified non-defendant HSU nursing staff, but he refused all treatment recommendations because he wanted to see a doctor. (ECF No. 21, ¶ 25.) Bowens first examined Brown on February 1, 2021. (*Id.*, ¶ 26.) At that appointment Brown told her that he had had a meniscus repair several years before and that he was supposed to have ACL surgery prior to his incarceration. (*Id.*) He detailed the October 2020 fall at Redgranite and reported that his knee occasionally "pops out." (*Id.*) He told her he does physical therapy and a home exercise program and that he was not experiencing disruption with daily function or

sleeping. (*Id.*) He further told her that he stopped taking the Naproxen. (*Id.*) Brown was concerned about losing the ability to exercise and complete daily tasks. (*Id.*) Bowens ordered another x-ray of his knee to compare to the October 2020 x-ray and additional physical therapy evaluation and treatment. (*Id.*)

Brown had another x-ray, and on February 3, 2021, a radiologist compared it with the October 2020 x-ray and reported there was no significant change. (ECF No. 21, ¶ 27.) Brown completed six physical therapy sessions between February 3, 2021, and March 10, 2021. (*Id*, ¶ 28.) During these sessions he was given exercises to do on his own and tried out a knee stabilization brace. (*Id.*) Brown eventually discontinued using the brace, but he reported that his knee had stopped "popping out" since starting physical therapy. (*Id.*) Brown was also given a TheraBand to strengthen his knee. (*Id.*, ¶ 30.)

On March 10, 2021, when Brown was climbing down the ladder from his top bunk, he tripped over his cellmate's wheelchair and reinjured his knee. (ECF No. 21, ¶ 32.) Security staff called HSU, and the nursing staff, based off what was reported by the security staff, determined that it was not an emergency situation and requested that Brown fill out a Health Services Request to be seen in the HSU. (*Id.*, ¶ 32.) On March 12, 2021, Brown was examined by a non-defendant unidentified nurse in the HSU. In addition to a headache and twisted right foot, Brown also told the nurse that his" right knee was throbbing constantly with intermittent shooting pain along [the] medial aspect of [his] right knee, with his right meniscus popping out at times." (*Id.*, ¶

5

34.) He further told the nurse that he was taking Naproxen for the pain but it was ineffective. (*Id.*)

On March 18, 2021, Brown was seen by another unidentified non-defendant nurse in the HSU for a follow-up visit for his knee pain. (ECF No. 21, ¶ 35.) At that appointment he refused Naproxen because he did not want to "rely on medication." (*Id.*) The nurse educated him on the benefits of Naproxen and gave him an ice bag. (*Id.*) The nurse also filled out a Special Needs Evaluation for a low bunk/low housing tier assignment. (*Id*, ¶ 36.) The request was denied on March 30, 2021, by the Special Needs committee because the accommodations were not medically necessary. (*Id.*, ¶ 41.)

On March 26, 2021, based on a referral request from Bowens, Brown was seen by non-defendant off-site orthopedic specialist Dr. Davis Tsai at the Kennedy Center Orthopedics. (ECF No. 21, ¶ 37.) Dr. Tsai reviewed Brown's medical history and his two prior x-rays. (*Id.*, ¶ 38.) He told Brown he had arthritis, but he did not have a meniscus repair like he thought he did. (*Id.*) Instead, it appeared he had "a prior medial meniscectomy." (*Id.*)

Dr. Tsai also noted that Brown may have had ACL issues in the past, "but now that arthritis was present, reconstruction was not warranted because the arthritis takes care of the laxity." (ECF No. 21, ¶ 37.) In short, Dr. Tsai did not recommend ACL surgery, deciding it was unnecessary because of Brown's arthritis. (*Id.*) Dr. Tsai also told Brown that he was "too young to undergo arthroplasty" or a knee replacement and that, because Brown had a history of abusing drugs, he was going to

6

experience pain at a more intense level than those who did not abuse drugs. (*Id.*) Dr. Tsai recommended that Brown take Naproxen for pain and wear a brace if it "felt better." (*Id.*, ¶ 39.) He also recommended that Brown lose weight to help with the pain caused by the arthritis. (*Id.*)

On May 7, 2021, Brown was examined by a non-defendant unidentified nurse in the HSU. (ECF No. 21, ¶ 43.) Brown told the nurse that.

> I feel like NP Bowens is turning a blind eye, and it's not right. I get that they don't want to pay for the surgery, but I don't want to sit in my cell all day. I am a very active person and walking over here hurts. When I was off-site, [the] specialist did not even address the torn ACL, he did not even address it. I move good. I can jog. I keep active. If that's what I have to do to stay fit and active.

(*Id.*) Brown also told the nurse that he was refusing to take pain medication because "that's what got me here in the first place." (*Id.*) The nurse determined that there was no deterioration in Brown's condition. (*Id.*)

On June 17, 2021, Bowens again examined Brown. (ECF No. 21, ¶ 44.) At that visit Brown told Bowens that he was unhappy with Dr. Tsai's recommendations-- specifically, his opinion that surgery was unnecessary. (*Id.*) Brown was not having difficulties with daily activities and could exercise. Brown also stated that the Naproxen was ineffective. (*Id.*) Bowens discussed different pain management options, and eventually added 1000 mg of acetaminophen. (*Id.*) She also scheduled a follow-up appointment for September 2021. (*Id.*)

On July 3, 2021, Brown was examined by a non-defendant unidentified nurse in the HSU. (ECF No. 21, ¶ 45.) Brown reported that he was having trouble playing

7

sports and that he believed he needed an MRI to prove that he had torn ligaments. (*Id.*, ¶ 46.) Brown was told that, because of his osteoarthritis, there was no reason for an MRI because that was the cause of his pain. (*Id.*) The nurse noted that Brown did not have issues walking. (*Id.*)

On August 6, 2021, Brown was examined by a non-defendant unidentified nurse in the HSU for ongoing knee pain. (ECF No. 21, ¶ 48.) Brown told the nurse that he was experiencing pressure behind his right knee and occasional sharp pains. (*Id.*) He admitted that he was not taking his pain medication. (*Id.*) He also stated that he wanted surgery before his release from incarceration. (*Id.*) Brown was provided with a topical cream for the pain and an ice bag. (*Id.*) He was also reminded that he had an appointment with Bowens in September 2021. (*Id.*)

On September 20, 2021, Bowens again examined Brown for his knee pain. (ECF No. 21, ¶ 50.) At that appointment Brown told Bowens that he could not "squat all the way to full extension" and that the knee pain was interfering with his sleep. (*Id.*) He stated that the Naproxen was ineffective. (*Id.*) In response to Brown's complaints about pain medication being ineffective, Bowens prescribed him 600 mg of ibuprofen and additional topical cream. (*Id.*, ¶ 51.)) She also categorized Brown as an individual with chronic pain issues, so that he could have routine follow-ups scheduled. (*Id.*) Bowens noted that Brown had no issues getting up and down off of the exam table and that he was able to "exercise vigorously 60 minutes a day, 3 days a week." (*Id.*) That was the last time Bowens examined Brown; she left Oshkosh on September 24, 2021. (*Id.*, ¶ 53.)

From September 2021 through May 2022, Brown's primary care provider was non-defendant Dr. Wheatly. (ECF No. 21, ¶ 55.) Neither party provides any details regarding the care Dr. Wheatly provided.

On May 21, 2022, Brown was examined by a non-defendant unidentified nurse because he had hyperextended his knee while playing basketball, and his substantial pain returned. (ECF No. 21, ¶ 54.) He stated that he was regularly taking Tylenol and ibuprofen. (*Id.*) The nurse noted that Brown had a slight limp. (*Id.*) The nurse reviewed care techniques for chronic knee pain; told him to protect his knee; recommended he avoid strenuous activity; and directed him to continue taking Tylenol and ibuprofen. (*Id.*)

On May 24, 2022, defendant Tracy Thompson, an APNP, examined Brown for the first time. (ECF No. 21, ¶¶ 2, 55.) Before the appointment, Thompson reordered acetaminophen for Brown. (*Id.*, ¶ 56.) Thompson assessed Brown's gait, which was normal with a full range of motion. (*Id.*, ¶ 57.) She reviewed Dr. Tsai's recommendations with Brown. (*Id.*, ¶ 58.) Brown stated that the pain medications were not working. (*Id.*, ¶59.) Brown acknowledged that his pain levels varied from day-to-day and stated that he was experiencing pain while sleeping because he was a side sleeper, so his knee did not have support. (*Id.*) Brown further stated that he was not wearing his knee brace; that he was working out regularly; and that he was playing "physical sports" regularly. (*Id.*, ¶ 60.) He told Thompson that the pain did not interfere with these activities. (*Id.*) Thompson discussed ways that Brown could proactively prevent pain, such as taking anti-inflammatory medications before a big

9

workout. (*Id.*, ¶ 59.) She also discussed with him the reality of his chronic pain and informed him it was unlikely that he would be pain free. (*Id.*, ¶ 62.) Thompson gave Brown a topical gel and Celebrex to manage the pain. (*Id.*, ¶ 63.) She recommended he wear a knee brace when working out or playing sports and ordered him an extra pillow to support his knee while sleeping. (*Id.*, ¶¶ 63-64.)

On July 12, 2022, Brown asked to be seen by his advanced care provider to review his plan of care for his knee pain. (ECF No. 21, ¶ 69.) On July 26, 2022, Thompson again examined Brown. (*Id.*, ¶ 70.) Brown told her he was not using the knee brace and that it did not help. (*Id.*) He was also still working out and playing sports regularly, and he had no intention to change his active lifestyle despite the pain in his knee. (*Id.*) Thompson explained that, because of his osteoarthritis, he would continue to have chronic knee pain, but she told him there was no apparent change in the condition of his knee. (*Id*, ¶ 71.) Thompson recommended that Brown consider lower-impact activities to prevent further degeneration of his knee. (*Id.*) She also increased his dose of Celebrex for pain management. (*Id.*)

After the appointment Thompson requested a functional assessment of Brown, wherein a nurse or security staff would observe Brown on a daily basis to see how he was functioning in day-to-day life. (ECF No. 21, ¶ 73.) Thompson wanted to see if Brown was wearing his brace during activities and what sports he was playing. (*Id.*, ¶ 72.)

On October 6, 2022, Brown was examined by a non-defendant unidentified nurse for a routine follow-up for his knee pain. (ECF No. 21, ¶ 74.) Before the

appointment Brown had had another x-ray, which showed arthritis. (*Id.*) He also completed two rounds of physical therapy and stated he was improving using a TheraBand. (*Id.*) He told the nurse that the pain medications were not working and requested to see his advanced care provider. (*Id.*, ¶ 75.) The nurse placed him on the referral list for an appointment with his advanced care provider. (*Id.*)

On November 11, 2022, Brown again went to the HSU for continued knee pain where he was examined by a non-defendant unidentified nurse. (ECF No. 21, ¶ 77.) He told the nurse he believed he had a torn ACL and requested an MRI to determine if he needed a knee replacement. (*Id.*, ¶¶ 77-78.) Brown stated that he was not playing basketball but was playing handball and wearing his brace. (*Id.*, ¶ 79.) He further indicated that the pain medication was not working. (*Id.*) The nurse reminded Brown that the off-site specialist did not recommend surgery because he was too young. (*Id.*, ¶ 80.)

Thompson reviewed the notes from Brown's November 11 visit. (ECF No. 21, ¶ 82.) Thompson made arrangements for Brown to get a new TheraBand and scheduled a nonurgent follow-up appointment. (*Id.*) On December 28, 2022,[1] Thompson examined Brown for chronic knee pain. (*Id.*, ¶ 85.) She noted that Brown continued to work out regularly and had no issues completing daily functions. (*Id.*) She further noted that he had a full range of motion. (*Id.*, ¶¶ 86, 90.) Brown requested a low bunk restriction, a

---

[1] The defendants detail Thompson's treatment of Brown all the way through July 2023. (ECF No. 21, ¶¶ 91-102.) However, Brown filed suit on December 20, 2022, and filed an amended complaint on February 20, 2023. The allegations in Brown's amended complaint ended with the December 28, 2022 appointment, so the court will not detail or consider Thompson's actions after that date.

11

low housing tier restriction, and special shoes. (*Id.*) Thompson explained to Brown that such resources were limited, and she did not think these accommodations were medically necessary to treat his knee pain. (*Id.*, ¶ 87.) Thompson reviewed pain management options with Brown, noting that he had not refilled any of his pain prescriptions in 206 days. (*Id.*, ¶ 88.) She recommended Brown try duloxetine, glucosamine chondroitin, or tricyclic antidepressants. (*Id.*) Brown expressed interest in glucosamine chondroitin but did not want to try duloxetine or the antidepressants. (*Id.*)

According to institution policy, glucosamine chondroitin required approval from the Medical Director or the Assistance Medical Director. (ECF No. 21, ¶ 89.) Thompson's request was not approved because Brown had not been using the pain medications previously prescribed to him. (*Id.*, ¶ 94.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

12

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Brown claims that the defendants violated his Eighth Amendment rights by failing to appropriately treat his knee injury. A prison official violates the Eighth Amendment when he is deliberately indifferent "to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[A] plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). For the purposes of summary judgment, the defendants concede that Brown's knee issues are objectively serious. (ECF No. 20 at 11-12.)

13

To demonstrate deliberate indifference, a plaintiff must show "that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). The plaintiff also "must show more than mere evidence of malpractice." *Id*. The plaintiff must demonstrate that the prison official's choices "were so 'significant a departure from accepted professional standards or practices' that it is questionable whether they actually exercised professional judgment." *Stallings v. Liping Zhang*, 607 Fed. Appx. 591, 593 (7th Cir. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). These choices include where a prison official fails to act or do anything to address the serious medical need. *See Gayton*, 593 F.3d at 623-624 (reversing summary judgment in favor of a nurse who refused to examine or treat a vomiting inmate). They also include where an official delays necessary treatment, aggravating a condition or needlessly prolonging a plaintiff's pain. *Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012).

Brown argues that the medical care provided by the defendants to treat his knee pain was inadequate because they refused to order an MRI, recommend knee replacement surgery, and provide accommodations like a low bunk restriction. Where a plaintiff is claiming that a medical provider's course of action was unconstitutional, he must show that the provider's "chosen 'course of treatment' departs radically from 'accepted professional practice,' [so that] a jury may infer from the treatment decision itself that no exercise of professional judgment actually occurred." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (quoting *Pyles*, 711 F.3d at 409). Additionally, a plaintiff must demonstrate that the provider's choices were "so blatantly inappropriate as to

14

evidence intentional mistreatment likely to seriously aggravate his serious medical condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). "Making that showing is not easy: 'A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Pyles*, 771 F.3d at 409 (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)).

No reasonable jury could conclude that either Bowens or Thompson were deliberately indifferent to Brown's knee issues. Brown disagrees with not only their assessment of his knee issues, but also the assessment of two orthopedic specialists, Dr. Nelson and Dr. Tsai. Brown believes that he has a torn ACL and needs an MRI and a knee replacement.

The overwhelming evidence, including medical records and emails describing his doctors' opinions, show that Brown's assessment of his own knee issues is baseless. According to the medical professionals, Brown suffers from arthritis, not a torn ligament. Brown does not submit any evidence other than his own belief that he tore his ACL and requires an MRI. A prisoner simply disagreeing with his doctor "generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles*, 771 F.3d at 409 (quoting *Sain*, 512 F.3d at 894-95). A plaintiff needs to "submit evidence from which a jury could reasonably find that [the doctor's] exercise of medical judgment departed significantly from accepted professional norms." *Id*. Brown fails to do so.

To the extent that Brown argues that the defendants failed to treat his knee pain, "[t]o say that the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd." *Snipes*, 95 F.3d at 592. No reasonable jury could conclude that the defendants' attempts to mitigate Brown's pain was blatantly inappropriate. Whenever Brown complained that the pain medicine was ineffective, the defendants tried different options. Their efforts were stymied by the undisputed fact that Brown was not taking proactive steps to mitigate his pain on his own. He refused to take offered pain medications, refused to wear his brace, and refused to stop engaging in high-intensity exercise or contact sports. The defendants cannot be held liable for Brown's choices.

Ultimately, Brown is upset because he did not receive an MRI, was not considered for knee replacement surgery, and still suffered from knee pain. Brown did not show that the defendants' decisions not to pursue an MRI or surgery or their decisions regarding pain management were so outrageous or blatantly inappropriate that even a non-medical professional would recognize those decisions as such. Summary judgment is granted in favor of the defendants.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. The defendants also argued that they were entitled to qualified immunity, but because the court granted summary judgment in their favor on the merits, it does not need to address the qualified immunity arguments. Because there are no remaining claims, the case is dismissed.

16

# ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 19) is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 16th day of May, 2024.

BY THE COURT

*William E. Duffin*

WILLIAM E. DUFFIN
United States Magistrate Judge